## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| SIERRA CONCRETE DESIGN, INC. | ) | Case No. 08-12029 (CSS) |
| TREVI ARCHITECTURAL, INC. | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| JEOFFREY L. BURTCH | ) | |
| CHAPTER 7 TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 10-52667 (CSS) |
| | ) | |
| REVCHEM COMPOSITES, INC., f/n/a | ) | |
| REVCHEM PLASTICS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

**CROSS & SIMON, LLC**
Kevin S. Mann
1105 North Market Street, Suite 901
Wilmington, Delaware 19801
        -and-
Andy Winchell
Law Offices of Andy Winchell
45 River Road, Suite 3
Lower Level
Summit, New Jersey 07901

Counsel for Defendant

**COOCH & TAYLOR, P.A.**
Adam Singer
R. Grant Dick IV
1000 West Street
10th Floor
Wilmington, Delaware 19801

Counsel for Plaintiff


Dated:  July 16, 2015

Sontchi, J._____

**INTRODUCTION**

This matter comes before the Court following trial between defendant, Revchem Composites, Inc., f/n/a Revchem Plastics, Inc., ("Revchem" or "Defendant") and plaintiff, Jeoffrey L. Burtch, Chapter 7 Trustee ("Trustee" or "Plaintiff") for Sierra Concrete Design, Inc. and Trevi Architectural, Inc. (collectively, the "Debtors"). The adversary action seeks recovery of preferential transfers, pursuant to 11 U.S.C. §§ 547, 550, and 502, made by the Debtors to Defendant. Defendant asserts the transfers are not avoidable under either section 547(c)(2) as they were made in the ordinary course of business or section 547(c)(1) as the transfers constituted a contemporaneous exchange of new value. For the reasons set forth below, the Court finds that Defendant has established that all of the transactions were in payment of a debt incurred by the Debtors in the ordinary course of business. Thus, judgment will be entered in favor of Defendant.

**JURISDICTION AND VENUE**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F) and this Court has the judicial power to enter a final order.

**STATEMENT OF FACTS**

**1) Procedural History**

On August 29, 2008 (the "Petition Date"), Trevi Architectural Inc. along with its parent company, Sierra Concrete Design, Inc. filed voluntary petitions for relief under

2

chapter 7 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware.  On August 29, 2008, Trustee was appointed as the interim trustee in both cases, and is serving as the chapter 7 trustee of Debtors' estates, pursuant to Section 702(d) of the Bankruptcy Code.  On October 16, 2008, the Court entered an order directing the procedural consolidation and joint administration of the above-captioned cases.[1]

On August 19, 2010, Trustee filed his Complaint commencing this adversary proceeding, which seeks to avoid and to recover preferential transfers against Revchem.[2] Through the Complaint, Trustee originally sought to avoid 27 transfers, totaling $612,879.94, as identified on Exhibit A of the Complaint.

On November 4, 2010, Defendant filed its Answer to the Complaint [D.I. 4].  On November 12, 2010, Defendant filed its Amended Answer to the Complaint [D.I. 5].  In the Amended Answer, Defendant asserted three separate affirmative defenses, pursuant to section 547(c) of the Bankruptcy Code. These defenses were the "contemporaneous exchange of new value defense," pursuant to section 547(c)(1), the "ordinary course of business defense," pursuant to section 547(c)(2), and the "subsequent new value defense," pursuant to section 547(c)(4).

---

[1] Case No. 08-12029 (CSS), D.I. 84.

[2] Adv. Pro. No. 10-52667 (CSS), D.I. 1.  Unless otherwise indicated, all references to the docket are to Adv. Pro. No. 10-52667.

On January 4, 2012, the Court entered its opinion regarding a summary judgment motion filed by Revchem.  *Burtch v. Revchem Composites, Inc.*, 463 B.R. 302 (Bankr. D. Del. 2012).

In the opinion, the Court granted, in part, and denied, in part, the Revchem summary judgment motion, stating that the "defendants have failed to establish that they are entitled to summary judgment under the ordinary course of business defense.  In addition, the defendants have established that, upon application of the subsequent new value defense, their preference liability is limited to $108,084.71."[3]

The Court stated that:

> In this case, the parties' pre-preference relationship was insufficient to establish the existence of an ordinary course of business. The parties' relationship prior to the preference period consisted of 17 checks covering approximately 68 invoices over an 11 month period. This is simply insufficient evidence for the creditors/defendants to meet their burden. Moreover, the defendants submitted insufficient evidence to establish the ordinary course of business in the industry, providing a one-paragraph, conclusory allegation in their supporting affidavit.
>
> * * *
>
> Even were the defendants' allegations sufficient to establish a pre-preference ordinary course of business, the creditors/defendants are not entitled to summary judgment. The activity between the parties in the 90 day preference period was inconsistent but generally showed a tightening of credit terms throughout the period and a modification of the parties' pre-preference communications and method of delivering payments, i.e., the creditors were providing more and more pressure on the debtor to accelerate its payments.

---

[3] *Burtch*, 463 B.R. at 308.

This is exactly the type of opt-out behavior the preference law is intended to thwart.[4]

On January 4, 2012, the Court entered its Order granting, in part, and denying, in part, the Revchem summary judgment motion. [D.I. 35]

## 2) Background and History Between the Parties

At trial, Defendant submitted a much more extensive record than it did on summary judgment.  Defendant offered the testimony of its Chief Executive Officer, Douglas Dennis.[5]   Dennis testified that Revchem's business centers on the distribution of reinforced plastic composites.  Defendant purchases raw materials from manufacturers and redistributes them to companies such as the Debtors.[6]  The composite products sold by Revchem are typically used to make component parts for marine constriction, plumbing fixtures, and aircraft.[7]  As a distribution company, most of Revchem's business is focused on the sale and logistics portion of distributing plastic composites. Prior to the Petition Date, Revchem provided goods to the Debtors for use in the Debtors' business.

Revchem and the Debtors began their business relationship in February 2004.  At that time, an oral agreement was entered into between Revchem and the Debtors, which provided payment terms and credit limit for the Debtors.[8] Dennis testified that the contract terms given to the Debtors were not different in any way from contracts entered

---

[4] *Id*. at 306.

[5] Trial Transcript at 13: 7-8.

[6] *Id*. at 14: 18-21.

[7] *Id*. at 16:6-9.

[8] *Id*. at 17: 18-20.

into with other customers.[9]  Revchem provided net 30 day payment terms to the Debtors from February 2004 through April 2007, and such payment terms were stated on each invoice sent by Revchem.[10]  From late April 2007 and through the Petition Date in August 2008 Revchem provided net 60 day payment terms to the Debtors, and such payment terms were stated on each invoice sent by Revchem.[11]  Dennis testified that Revchem obtained credit insurance from Euler Hermes for top revenue accounts to provide a credit limit to those top revenue customers, the Debtors being one of the insured accounts.[12]  At all relevant times (May 2007 through August 2008), the Debtors' credit limit was $150,000 and, otherwise, Debtors were required to pay according to net 60 terms.[13]  Dennis testified that Revchem never filed a claim to its credit insurance company related to the Debtors, opting rather to work with the account to bring it within the credit limit.[14]

Dennis testified, and Defendant's Trial Exhibit B shows, that during the course of the business relationship the Debtors used three methods for paying invoices: 1) credit card; 2) check and; 3) wire transfer.[15] An examination of Defendant's Trial Exhibit B indicates that the majority of invoices were paid by check.[16]

---

[9] *Id.* at 17: 19-25.

[10] *Id.* at 41: 10-18.

[11] *Id.* at 42:9-14.

[12] *Id.* at 44: 1-11

[13] *Id.* at 7:10-15.

[14] *Id.* at 45: 9-16.

[15] *Id.* at 28-29:20-4.

[16] Defendant's Trial Exhibit B.

Dennis testified that the Debtors typically ordered product from Revchem via telephone.  The ordering process consisted of documenting the order at the customer service level.  The order would then go to accounting where Revchem's accountants typically check outstanding invoices or credit limits.  Once that review was completed the order would be converted into an invoice and would be sent to the warehouse for shipment.[17]  Dennis testified that the process from order to invoice and shipment took anywhere from one to four days.[18]

During the Historical Period (February 2004 through April 2008), 477 orders were made by the Debtors and 190 transfers were sent from the Debtors to Revchem.  From February 2004 through April 2007, Debtors were required to make payments according to net 30 terms; from April 2007 through the Petition Date, Defendant increased the term to net 60 days.[19]  The payments made by the Debtors to Revchem ranged from $5.00 to $27,000.00.  During the Historical Period, the date range between issuance of the invoice and payment of the invoice ranged from 0 days to 116 days.[20]  The average days-to-pay in the Historical Period was 55.22.

During the Preference Period (May 2008 through August 2008), there were 133 orders sent to Revchem by the Debtors and 28 transfers from the Debtors to Revchem. The payments made by the Debtors during the Preference Period ranged from $33.00-

---

[17] Trial Transcript at 26-27:22-1.

[18] *Id.* at. 27: 2-4

[19] Defendant's Trial Exhibit A. See Defendant's Trial binder #2 (Invoices from 2004-April 2007 on Net 30 terms). *See* Defendant's Trial Binder #3, p. 01775 (first invoice in April 2007 providing Net 60 day terms).

[20] Defendant's Trial Exhibit B.

$50,000.00.  During the Preference Period, the date range between issuance of the invoice and payment of the invoice ranged from 13 days to 61 days.[21] The average days-to-pay during the preference period was 27.3 days.   The parties' payment history is summarized below.

| Year | Total Invoices | Payment Terms | Days to Pay (Average) |
|---|---|---|---|
| **2004** | 64 | Net 30 | 29 |
| **2005** | 73 | Net 30 | 53.6 |
| **2006** | 163 | Net 30 | 41 |
| **2007** | 52 | Net 30 | 78.75 (Jan. - April) |
| **2007** | 87 | Net 60 | 68.25 (May-Dec) |
| **2008** | 171 | Net 60 | 46.14[22] |
| **Total** | 610 | Net 30/60 | 52.8 |

**Days-to-Pay Average : Net 30 & Net 60**

| Years | Payment Term | Days to Pay (Average) |
|---|---|---|
| **2004-2007** | Net 30 | 50.4 |
| **2007-2008** | Net 60 | 57.1 |

**Days-to-Pay Average: Historical Period & Preference Period**

| Time Period | Payment Term | Days to Pay (Average) |
|---|---|---|
| **Historical Period** | Net 30<br>Net 60 | 50.58<br>60.25 |
| **Preference Period** | Net 60 | 27.3 |

---

[21] *Id.*

[22] This average takes into account the 39 unpaid invoices sent during the Preference Period as of the Petition Date.

During both the Historical Period and Preference Period, checks sent to Revchem by the Debtors were commonly earmarked with references to specific invoices to pay down existing balances on previously ordered product. Revchem generally applied payments in accordance with the customer's instructions or to the oldest outstanding invoice if there were no specific instructions.[23]   For example, Check no. 2493 (issued during the Historical Period) was issued with reference to pay certain amounts on certain invoices.[24] Check no. 6835 (issued during the Preference Period) was issued with reference to pay certain amounts on certain invoices.[25] A review of Plaintiff and Defendant trial exhibits indicates that the pattern of sending single checks with multiple references was the common practice employed by the Debtors to pay invoices and maintain Debtors' credit balance during both the Historical and Preference Periods.[26]

**Historical Period:**

| Check No. | Check Cut Date | Invoice Date | Invoice Number | Original Amount | Balance Due | Payment |
|---|---|---|---|---|---|---|
| 2493 | 11/10/2006 | 10/1/2006 | 445673 | 14,606.43 | 14,606.43 | 14,606.43 |
|  |  | 10/3/2006 | 443974 | 269.30 | 269.30 | 269.30 |
|  |  | 10/3/2006 | 443973 | 1,500.00 | 1,500.00 | 1,500.00 |
|  |  | 10/9/2006 | 443975 | 3,326.54 | 3,326.54 | 3,326.54 |

---

[23] Certification of Michael Disbrow ¶ 3. [D.I. 73]

[24] Defendant's Trial Exhibit A p. 01479. Exhibit B

[25] *Id*. at p. 00625. Exhibit B.

[26] *See* Plaintiff's Trial Exhibit 6.

**Preference Period:**

| Check No. | Check Cut Date | Invoice Date | Invoice Number | Original Amount | Balance Due | Payment |
|---|---|---|---|---|---|---|
| 6835 | 8/8/2008 | 7/1/2008 | 50097B | 50.00 | 50.00 | 50.00 |
| | | 7/18/2008 | 503290 | 39,827.45 | 9,827.45 | 9,827.45 |
| | | 7/21/2008 | 503393 | 33,330.41 | 20,000.00 | 20,000.00 |
| | | 7/22/2008 | 503822 | 205.69 | 205.69 | 205.69 |
| | | 8/1/2008 | 504236 | 1,436.16 | 1,436.16 | 1,436.16 |

On several occasions during the Preference Period, the Debtors would be at or near their credit limit. [27] Dennis testified that the decision to allow the Debtors to maintain a credit balance at or near the limit was a business decision by Revchem.[28] He further testified that at no time did Revchem engage in aggressive collection proceedings against the Debtors in order to satisfy an outstanding balance or to bring the Debtors back below the credit limit.[29] In situations where the Debtors were at or near the credit limit, Revchem would require the Debtors to pay previously issued invoices in order to get new product.[30]

During the 18 months prior to the Petition Date, the Debtors were engaged in a construction project with a tight completion deadline. As the completion deadline (and the eventual Petition Date) approached, the Debtors were ordering product and paying

---

[27] Defendant's Trial Exhibit A pp. 00576-00583. The exhibit shows that each month Revchem tracked the Debtors' accounts receivable and that on three occasions the Debtors were over their credit limit at months end: March 2008; May 2008; July 2008. See also Joint Pretrial Order p.20.

[28] Trial Transcript at 28: 1-9

[29] *Id*. at 28:10; 31:17-20

[30] *Id*. at 28:13-19. See also the chart, *supra,* regarding check no. 6835.

invoices at a slightly faster rate than the Debtors had done in the past.[31]    The testimony of Dennis, and a review of Defendant's Trial Exhibit B, indicate that the Debtors were paying invoices at a faster rate during the Preference Period to maintain a credit balance near the limit imposed by Revchem.

During the Preference Period, the Debtors made transfers to Revchem totaling $612,879.94.[32]    In the Court's summary judgment decision, it applied subsequent new value, both paid and unpaid, in the amount of $504,795.23, thereby reducing Revchem's preference liability to $108,084.71.[33]    As such, the dispute presently before the Court is whether seven (7) transfers in the amount of $172,932.14 are protected by the ordinary course of business defense set forth in section 547(c)(2) or protected by the contemporaneous exchange for new value defense set forth in section 547(c)(1).

## LEGAL DISCUSSION

### 1) Avoidable Transfers

Under 11 U.S.C. § 547(b), Congress "broadly authorized bankruptcy trustees to 'avoid any transfer of an interest of the debtor in property' *if* five conditions are satisfied and *unless* one of seven exceptions defined in subsection (c) is applicable."[34] The five required conditions are listed in section 547(b)(1)-(5), as follows:

The transfer was -

(1) to or for the benefit of a creditor;

---

[31] Defendant's Trial Brief p.3.

[32] Joint Pretrial Order p.3-4.

[33] *Burtch,* 463 B.R. at 307–308.

[34] *Union Bank v. Wolas*, 502 U.S. 151, 154 (1991) (italics in original).

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

> (A) on or within 90 days before the date of the filing of the petition; or

> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

> (A) the case were a case under chapter 7 of this title;

> (B) the transfer had not been made; and

> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Unless each and every one of these elements is proven, a transfer is not avoidable as a preference under 11 U.S.C. § 547(b).[35]  In addition, 11 U.S.C. § 547(g) places the burden of proof for these elements on the Trustee.

First, section 547(b)(1) requires that the transfer be "to or for the benefit of a creditor." This requirement has been loosely construed by the courts.[36]  The Code defines a creditor as an "entity that has a claim against the debtor;"[37] a "claim" as a "right to

---

[35] *Waslow v. The Interpublic Group of Cos., Inc. (In re M Group, Inc.),* 308 B.R. 697, 700 (Bankr. D. Del. 2004); *In re IT Grp., Inc.,* 331 B.R. 597, 601 (Bankr. D. Del. 2005).

[36] *In re CVEO Corp.,* 327 B.R. 210, 214 (Bankr. D. Del. 2005).

[37] 11 U.S.C. § 101(10).

payment;"[38] and a "payment" as a "performance of an obligation by the delivery of money or some other valuable thing accepted in partial or full discharge of the obligation."[39]

Second, section 547(b)(2) requires that the transfer be "for or on account of an antecedent debt" owed by the Debtor before such transfer was made.    A debt is antecedent for the purposes of section 547(b) if it was incurred before the debtor made the allegedly preferential transfer.[40]  In addition, a debt is deemed to have been incurred "on the date upon which the debtor first becomes legally bound to pay."[41]

Third, a debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition, pursuant to section 547(f).

Fourth, any preferential transfer must also occur within the voidable preference period: within 90 days before the date of the filing of the petition, or within one year if transfers were made to company insiders.

Fifth, an avoidable transfer must enable a creditor to receive more than if the transfer had not been made, and if the creditor received payment of such debt to the extent provided by the provisions of Title 11.  The Supreme Court has held that whether a particular transfer is preferential should be determined "not by what the situation would have been if the debtor's assets had been liquidated and distributed among his

---

[38] *Id.*

[39] *In re Bake–Line Grp., LLC,* 359 B.R. 566, 577 (Bankr. D. Del. 2007) (quoting Black's Law Dictionary 1165 (8th ed. 2004)).

[40] *Peltz v. New Age Consulting Servs., Inc.,* 279 B.R. 99, 102 (Bankr. D. Del. 2002).

[41] *Id. Accord In re CVEO Corp.,* 327 B.R. at 214.

creditors at the time the alleged preferential payment was made, but by the actual effect of the payment as determined when bankruptcy results."[42]  The relevant inquiry for the Court is whether Defendant would have received a 100 percent payout in a Chapter 7 liquidation.[43]  If so, no preference can be recovered; if not, the requirements of section 547(b)(5) are met.[44]  As a matter of general arithmetic, any transfer to a general unsecured creditor ordinarily satisfies this test unless the debtor's estate turns out to be solvent in Chapter 7.[45]

Here, there are seven transfers totaling $172,932.14 at issue.[46]  The parties have agreed that each of the transfers satisfies section 547(b) and, thus, are avoidable as preferences.[47]  The question then becomes whether Defendant has established, in whole or in part, an affirmative defense under section 547(c) that would render the transfers as not avoidable.

As set forth above, the Court previously entered partial summary judgment in favor of Defendant under the "subsequent new value" defense under section 547(c)(4).

---

[42] *Palmer Clay Products Co. v. Brown*, 297 U.S. 227, 229 (1936).

[43] *See In re Vaso Active Pharm., Inc.*, 500 B.R. 384, 394 (Bankr. D. Del. 2013) ("The resulting analysis therefore requires that in determining the amount that the transfer 'enables [the] creditor to receive,' such creditor must be charged with the value of what was transferred plus any additional amount that he would be entitled to receive from a Chapter 7 liquidation: 'The net result is that, as long as the distribution in bankruptcy is less than one-hundred percent, any payment "on account" to an unsecured creditor during the preference period will enable that creditor to receive more than he would have received in liquidation had the payment not been made'.") (quoting *In re Lewis W. Shurtleff, Inc.*, 778 F.2d 1416, 1421 (9th Cir. 1985); *In re AmeriServe Food Distribution, Inc.*, 315 B.R. 24, 32 (Bankr. D. Del. 2004); *Matter of Total Technical Servs., Inc.*, 150 B.R. 893, 903 (Bankr. D. Del. 1993)).

[44] *See In re AmeriServe*, 315 B.R. at 32.

[45] George M. Treister et al., FUNDAMENTALS OF BANKRUPTCY LAW § 4.03(c)(1)(G)  (6th ed. 2006).

[46] Trial Transcript at 5.

[47] Joint Pretrial Order at 7; Trial Transcript at 9

The remaining transfers at issue are not subject to that defense.  The sole remaining affirmative defenses asserted by Defendant are "ordinary course of business" under section 547(c)(2) and "contemporaneous exchange of new value" under section 547(c)(1).

## 2)  Ordinary Course of Business Defense

Even if a transfer satisfies all the elements of section 547(b), it nevertheless may not be avoided if the opposing party proves that the transfer satisfies one of the exemptions listed in section 547(c).[48]   The party contending that the transfer falls under one of the exemptions bears the burden of proving that assertion by a preponderance of the evidence.[49]

Section 547(c)(2) permits a "safe harbor" for preferential transfer payments if "such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was (a) made in the ordinary course of business of the debtor and transferee, or (b) made according to ordinary business terms."[50]  Defendant bears the burden of proof.[51]

Here, it is not disputed that the transfer was in payment of a debt incurred by the Debtors in the ordinary course of business or financial affairs of the Debtors and the transferee.[52]

---

[48] *In re Archway Cookies*, 435 B.R. 234, 240 (citing *In re M Grp., Inc.*, 308 B.R. at 701).

[49] 11 U.S.C. § 547(g). *See also In re First Jersey Sec., Inc.*, 180 F.3d 504, 512 (3d Cir. 1999) ("The burden is on the transferee to satisfy each statutory element by a preponderance of the evidence.") (citing *J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp.*, 891 F.2d 66, 69–70 (3d Cir. 1989)).

[50] *In re Am. Home Mortgage Holdings, Inc.*, 476 B.R. 124, 135 (Bankr. D. Del. 2012) (citing 11 U.S.C. § 547(c)(2)(A)–(B)) (internal quotations omitted).

[51] 11 U.S.C. § 547(g).

[52] Joint Pretrial Order at 13, n. 4.

a)      **Ordinary Course of Business of the Debtor and Transferee**

The determination of whether a creditor has met its burden under section 547(c)(2)(A) is a subjective test, "calling for the Court to consider whether the transfer was ordinary as between the debtor and the creditor."[53] Courts have considered a myriad of factors in this test, including: (1) the length of time the parties engaged in the type of dealing at issue; (2) whether the subject transfers were in an amount more than usually paid; (3) whether the payments at issue were tendered in a manner different from previous payments; (4) whether there appears to have been an unusual action by the debtor or creditor to collect on or pay the debt; and (5) whether the creditor did anything to gain an advantage (such as additional security) in light of the debtor's deteriorating financial condition.[54] No one factor is determinative.[55] To determine whether transfers were in the ordinary course of business the Court must first determine what the ordinary course of business was and then compare the preferential transfers to it.[56]

i)   **The Parties' Ordinary Course of Business**

The Court must first review the length of the business relationship between Debtors and Defendant to determine if their relationship was "of recent origin," as

---

[53] *First Jersey Sec., Inc.*, 180 F.3d at 512 ("…[T]he determination of what is 'in the ordinary course of business' is subjective, calling for the Court to consider whether the transfer was ordinary as between the debtor and the creditor.")

[54] *Am. Home Mortgage*, 476 B.R. at 135-36 (citing *Archway Cookies*, 435 B.R. at 242; *In re Hechinger Inv. Co. of Delaware, Inc.*, 320 B.R. 541, 548–49 (Bankr. D. Del. 2004)).

[55] *Burtch*, 463 B.R. at 306.

[56] *Id.*

opposed to being "cemented long before the onset of insolvent."[57] "Bankruptcy policy, as evidenced by the very existence of § 547(c)(2), is to promote such continuing relationships on level terms, relationships which if encouraged will often help businesses fend off an unwelcome voyage into the labyrinths of a bankruptcy."[58]   In this case, the parties' relationship was established over a four and a half year period and during their relationship there were approximately 610 transactions between the parties.[59]  Based on the length of their business relationship and the numerous transactions between the parties, the Court finds that this relationship was easily of sufficient length to establish an ordinary course of dealing between the parties.[60]

In support of its burden to prove the section 547(c)(2) defense, Revchem presented the testimony of its owner and Chief Executive Officer and trial exhibits containing every invoice from February 2004 through the Petition Date in August 2008.[61] Revchem's Trial Exhibit B summarizes all transactions between the Defendant and the Debtors during their business relationship. Exhibit B details the date invoices were issued, the amount of the invoice, the date payment was received and the number of days between the invoices issue date and corresponding payment date.

---

[57] *Archway Cookies,* 435 B.R. at 242. (quoting *In re Model Acoustical Products, Inc.,* 18 F.3d 217, 225 (3d. Cir. 1994)).

[58] *Model Acoustical,* 18 F.3d at 225.

[59] Defendant's Trial Exhibit B.

[60] It is worth noting that the evidence submitted at trial was vastly more extensive than that put before the Court at the summary judgment stage at which time the Court declined to enter judgment on this defense.

[61] Defendant's Trial Exhibit B.

From February 2004 through the Petition Date there were approximately 610 total invoices received by Revchem from the Debtors. As stated *supra*, the parties' payment terms from February 2004 to April 2007 were net 30 days, and net 60 days from the end of April 2007 through the Petition Date in August 2008. From February 2004 through the Petition Date in August 2008 the Debtors paid invoices back within approximately 52.8 days.[62]  In support of the argument that the dealings between Revchem and the Debtors were ordinary Dennis testified that it was not unusual to have a variation in the time of payment for a customer, including the Debtors.[63]  In further support of the ordinary course of business defense, Dennis testified that other than letting the Debtors know they were at or near their credit limit Revchem never pressured the Debtors to pay outstanding invoices at a faster rate than usual.[64]

In the situation where the parties have a founded tradition of prior dealings, the focus is on those dealings; where the parties have a short history of dealings, the creditor is required to fill the "gap" by reference to a more extensive and exacting analysis of industry standards.[65]  With respect to subsection 547(c)(2)(B), lateness of payment does not preclude a finding that the payment was made in the ordinary course, and indeed a pattern of late payments can establish an ordinary course between the parties.[66]  The

---

[62] *Id.* (total time elapsed between invoice and payment includes the 39 unpaid invoices as of the petition date).

[63] Trial Transcript at 30: 17-19.

[64] *Id.* at 31-32.

[65] *Archway Cookies*, 435 B.R. at 240 (citing *In re U.S. Interactive, Inc.* 321 B.R. 388, 392-393 (Bankr. D. Del. 2005)).

[66] *In re Big Wheel Holding Co., Inc.*, 223 B.R. 669, 674 (Bankr. D. Del. 1998).

unrebutted evidence contained in Defendant's Trial Exhibit B, and further substantiated by the testimony of Dennis, establishes that the late payments were in the ordinary course of business between the parties. Based on the pattern payments being near, or past the terms on the invoices, the Court finds that these patterns over four and a half years establish an ordinary course of business between the parties.

As the facts discussed above indicate, the Debtors had either made payments in consideration of the days-to-pay condition of the credit agreement or in consideration of the credit limit, depending on which limit was most applicable at any given time.[67]  There was no testimony that the amounts paid during the Preference Period were more than was usually paid or that payment was made in any way other than what was customary between the parties. Revchem's trial exhibits and the testimony of Dennis establish that partial payments were common and that the method of payment was predominately by check. Revchem further established that there were no unusual actions taken by Revchem or the Debtors to collect or to pay, respectively, the invoices.  Dennis testified that his company tried not to take an excessively hard line in terms of enforcing their credit limit or days-to-pay terms, and that their policy was to do what was best for the business relationship, which in this case was to allow the Debtors to approach and exceed their credit limit while still receiving product.[68]  Trustee has failed to produce evidence to the contrary.  Dennis also testified that he was not aware of the Debtors deteriorating

---

[67] Defendant's Trial Exhibit B.

[68] Trial Transcript at 28:

financial condition and did nothing to gain an advantage from that condition.[69] Therefore, the length of the parties' relationship, the similarity of the payments during their entire relationship and the lack of evidence showing unusual collection practices or positioning on part of Defendant to gain an advantage over the Debtors show that the transfers at issue were made in the ordinary course of the business of the parties.

### ii) The Preferential Transfers

As stated by this Court in *In re Archway Cookies,* the Court must compare the transfers in the Historical Period to those in Preference Period to determine if the transactions were sufficiently similar. Having established the existence of an ordinary course of business (either among the parties or the industry), the creditor must prove that the transactions in the 90-day preference period materially complied with that pre-preference behavior.[70] The Court finds that the transactions during the Preference Period were materially similar to those made during the Historical Period and, therefore, were in the ordinary course of the parties' business. The credit agreement during the Preference Period did not vary from that of the Historical Period; the payments were tendered by check, the same as the majority of the transactions in the Historical Period; there was no unusual action by Defendant to collect on the debt and there was no unusual action by the Debtors to pay the debt; and Defendant did not do anything to gain an advantage over the Debtor during either the Preference Period.

---

[69] Trial Transcript at 31: 6-15.

[70] *Burtch,* 463 B.R. at 306.

In determining ordinary course of dealings between parties, "[c]ourts place particular importance on the timing of payment."[71] Courts have found that small deviations in the timing of payments may not be so significant as to defeat the ordinariness of such payments.[72] In contrast, courts have held greater deviations in payment timing sufficiently significant to defeat the ordinariness of such payments.[73]

As stated above, in the case at bar, the parties' course of dealings was established over a four and a half year period. During the first three and a half years of their business relationship Defendant provided the Debtors with net 30 day payment terms. For the last year and a half of the parties' relationship Defendant provided the Debtors with net 60 day payment terms and a credit limit of $150,000. These facts distinguish the case at bar from cases such as *In re Archway Cookies* for several reasons. First, unlike the creditor and debtor in *Archway Cookies*, the parties in this case changed their payment terms during their relationship, increasing the days-to-pay from 30 to 60. Second, in the case at bar, along with a days-to-pay requirement there was also a credit limit. The facts of this case show that during the Historical Period the Debtors paid invoices 55.22 days after the creation of the invoices, contrasted to the 27.3 day average during the Preference Period.

---

[71] *Archway Cookies*, 435 B.R. at 243 (quoting *Radnor Holdings Corp. v. PPT Consulting, LLC (In re Radnor Holdings Corp.)*, Case No. 06-10894, 2009 WL 2004226, *5, Bankr. LEXIS 1815, *14 (Bankr. D. Del. July 9, 2009)).

[72] *Id.*

[73] *Id.* at 244.  In *Archway Cookies* the parties credit agreement provided for net 20 day payment terms. The Court in *Archway Cookies* found during the Historical Period the average days-to-pay was 42.3 days, and the average days-to-pay during the Preference Period was 47.2 days, therefore resulting in a 4.9 day difference. The Court held that the difference was not material and that there was no evidence of differing payment practices between the parties.

21

Although the difference of 27.9 days is a significant deviation from the pre-preference average the record and testimony of Dennis indicate the Debtors were engaged in a construction project during the Preference Period that required product at a faster rate, therefore resulting in the payment of invoices at a faster rate during the Preference Period as compared to the Historical Period.[74]  Although the Debtors were paying invoices at a faster rate during the Preference Period the days-to-pay agreement was not the only controlling factor in the business relationship of the parties. The second factor and the one tending to show that the Preference Period activity between the Debtors and Defendant was materially similar to the Historical Period was the credit limit term which, like the days-to-pay term, was not strictly enforced by Defendant during either the Historical Period or Preference Period.

When a creditor has changed the parties' credit arrangement during the preference period courts have found that such action on the part of the creditor was not in the ordinary course of the parties' business. [75] In *In re Hechinger,* the creditor and debtor changed their credit terms immediately prior to the beginning of the preference period and the debtor began making payments on a more accelerated basis. The Court found the change in the parties' credit agreement and timing of payments to be "so extreme, and so

---

[74] It must be noted that the days-to-pay average for the preference period accounts for 39 invoices that remain unpaid.

[75] *In re Hechinger Inv. Co of Delaware, Inc.* 489 F.3d 568, 577 (3d Cir. 2007)(citing  *In re Roberds, Inc.,* 315 B.R. 443 (Bankr. S.D. Ohio 2004)) ((1) The credit limit of $750,000 was vigorously enforced by the creditor; (2) credit holds, involving individual negotiations resulting in payments satisfactory to the creditor prior to the shipment of furniture, were in effect; (3) payment terms were changed; (4) the Debtor paid, on average, earlier than net 30 terms; and (5) other creditors were being significantly delayed, or denied, in the receipt of their payments while this creditor was receiving accelerated payments and-none of these events had ever occurred in the parties history.)

out of character with the long historical relationship between the parties'" to be out of the ordinary course of business.[76]  In the case at bar, the Court finds the transfers during the Preference Period were materially similar to those made during the Historical Period because the parties did not alter their credit agreement during the Preference Period and Defendant did not take steps to enforce the terms of the credit agreement in a different manner than the Historical Period.

Trustee, relying on the Defendant's payment records, argues that the credit agreement was not followed in the same way during the Preference Period as the Historical Period. To support this argument Trustee relies on the fact (1) the Debtors were ordering and paying for product at an accelerated rate, (2) that, on three occasions during the Preference Period, Revchem shipped products on the same day the product invoice was created,[77] which deviated from the practice in the Historical Period, and (3) that on several occasions during the Preference Period, the Debtors were at or exceeded the credit limit and Defendant continuously allowed the Debtors to receive products despite being over the credit limit, therefore deviating from the credit arrangement and, thus, according to Trustee, making the payments during the Preference Period out of the ordinary course of business.[78]

---

[76] *Id* at 557

[77] Trial Transcript at 51-52. The three invoices Trustee points to are numbers 501250, 501792 and 501980. Invoice 501250 corresponds to an order taken on 6/23/2008 and an invoice created and shipped on 6/26/2008. Invoice 501792 corresponds to an order taken on 6/17/2008 and an invoice created and shipped on 7/1/2008. Invoice 501980 corresponds to an order taken on 6/23/2008 and an invoice created and shipped on 7/3/2008.  Invoice 501250 Defendant's Exhibit A p. 2106; Invoice 501792 Defendant's Exhibit A p. 2119; Invoice 501980 Defendant's Exhibit A p. 2126.

[78] Trial Transcript p. 48-49.  Trustee points to Revchem's open accounts receivable for the months of March 2008 through August 2008. As of March 31, 2008, Debtor's owed Revchem $171,227.49; May 2008 Open

Trustee's arguments are unpersuasive.  At trial, Revchem offered the testimony of Dennis and introduced Defendant's exhibits illustrating the parties' transactional history in support of its burden to prove the preferential transfers were materially similar to the transfers in the Historical Period.  The testimony of Dennis indicates that it was not Revchem's policy to take a hard line on customers who were either late on payments or over their credit limit. This testimony is supported by a review of Defendant's Trial Exhibit B with shows, *inter alia*, a history of the Debtors being either late paying invoices, or alternatively, close or over the credit limit and, therefore, paying invoices in an effort to reduce the credit balance that was in excess of the limit.

Trustee has failed to put forth evidence that Defendant placed credit holds on the Debtors accounts during the Preference Period or Historical Period or that the parties' deviations from the terms of the credit agreement were unusual. To the contrary, Defendant's trial exhibits indicate that the credit agreement was the same from May 2007 through the Petition Date in August 2008. An examination of the transaction history further shows it was common for Defendant to allow the Debtors to either exceed their days-to-pay term or the credit limit. The exhibits show that, on three occasions during the Preference Period, the Debtors were over the credit limit according to end-of-month accounting records but continued receiving product from the Defendant.[79]  There is no evidence that the Defendant was trying to obtain payment on an accelerated basis during

---

A/R $198,986.43; June 2008 Open A/R $147,840.47; July 2008 Open A/R $217,048.72; August 2008 Open A/R $133,110.55.

[79] *Id.*

the Preference Period. The evidence supports the finding that the Debtors were merely trying to pay according to the terms of the parties' agreement, specifically in an effort to maintain a balance with the Defendant according to the credit limit so that the Defendant would continue to send product to the Debtors despite the Debtors exceeding the credit limit.

As the Declaration of Michael Disbrow, Revchem's Controller, and simple logic indicate, the common practice during both the Historical Period and Preference Period was to receive checks from the Debtors and apply them to the invoices earmarked on the check or to the oldest invoices if no instructions came with the check, therefore accomplishing two tasks (1) satisfying outstanding invoices that had exceeded the net days-to-pay; and (2) reducing the outstanding credit balance (if any existed) to remain in compliance with the limit.

Finally, Dennis testified that the credit limit was the only control the Defendant had over the Debtors paying invoices,[80] meaning along with invoices being past due, if a customer was at its credit limit the Defendant could refuse to ship product. The record reflects that the Debtors were paying invoices during the Preference Period in consideration if its credit limit. The record further reflects that at no time during either the Historical Period or Preference Period did the Defendant strictly enforce either the days-to-pay term or the credit limit term of the credit agreement. The Defendant's trial exhibits indicate that the Preference Period was the only time during the parties' business

---

[80] Trial Transcript at 32: 6-9

relationship the credit limit was met, or exceeded, but this does not negate that fact that the same credit limit was present for the year prior to the Preference Period or make payments according to the terms of the credit agreement unusual.  The testimony and record indicate the ordinary course of dealings between the parties was to either (1) pay the oldest invoices because they were past due or (2) pay old invoices to bring the Debtor below the credit limit.

Deviations from the terms of the credit agreement were common between the parties in terms of either being late or over the credit limit during both the Historical Period and Preference Period and it was the Defendant's position not to be excessively hard line in enforcing the terms of the agreement. Further, there is neither evidence to show that the Defendant or Debtors engaged in any unusual behavior in collecting or tendering payment nor evidence that the Defendant did anything to gain an advantage over the Debtors.  Therefore this Court finds that the Debtors were paying according to the credit agreement during the Preference Period and, therefore, the preferential transactions were in the ordinary course of the parties' business under section 547(c)(2)(a).

### b)  In Accordance with Ordinary Business Terms

The phrase "ordinary business terms" looks to general norms within the creditor's industry.[81]  As the Third Circuit has held, transfers may be avoided only if they are "so idiosyncratic as to fall outside that broad range" of practices customary in the creditor's

---

[81] *Am. Home Mortgage,* 476 B.R. at 140.

industry.[82]  This Court and others within the Third Circuit have frequently characterized "ordinary business terms" as embracing a "broad range" of credit practices that are "in harmony with the range of terms prevailing as some relevant industry norms."[83]  While expert testimony is not necessarily required, a defendant must provide admissible, non-hearsay testimony related to industry credit, payment, and general business terms in order to support its position.[84]

Defendant has sought to establish the industry standard through Dennis who has 40 years of experience in the plastics industry.[85]  Dennis testified that typical contract terms in the composites industry are a length of time for payment and a credit limit, that Debtors were given a net 60 day length of time to make payment(s) on invoices, that these terms do not differ from the industry standard, that competitors in the composites industry structure their contract similarly, and oral contracts are typical in the composites industry.[86]  No supporting data or reports were provided to substantiate Dennis's allegations.  In opposition, Trustee points out that Dennis did not review industry documents, articles about the composites industry, nor did he consult any chemical composites CEO's in the same industry in preparation of his testimony regarding the

---

[82] *Molded Acoustical Products, Inc.*, 18 F.3d at 220.

[83] *Am. Home Mortgage*, 476 B.R. at 140-41 (citing In *re Forklift LP Corp.*, 340 B.R. 735, 739 (D. Del. 2006)).

[84] *In re Hechinger Liquidation Trust*, 298 B.R. at 242.

[85] Trial Transcript p. 14

[86] *Id.* at 17-18.

industry standard, thus, arguing that it is insufficient proof to establish an ordinary course defense under the objective test.[87]  The Court agrees with Trustee's position.

Defendant has not met its burden of proof in providing the Court with enough information to determine the "ordinary business terms" in the industry.  "Courts have rejected evidence of an industry standard where it is too general.  Instead, courts look for objective definitive evidence supported by specific data to meet the burden of proof."[88] Within *In re U.S. Interactive, Inc.*, Judge Walrath rejected testimony that was imprecise and which did not provide any objective basis or statistical analysis for its conclusion.[89] Although witnesses who have worked in the company and in the industry may be prime candidates for providing relevant testimony,[90] this testimony will also only be useful if "the court determines that the employees are credible and have significant and relevant industry experience."[91]  Within *In re Sacred Heart Hosp. of Norristown*,[92] the Bankruptcy Court in the Eastern District of Pennsylvania rejected evidence which was "totally lacking

---

[87]  *Id.* at 55-56.

[88] *In re U.S. Interactive, Inc.*, 321 B.R. 388, 393 (Bankr. D. Del. 2005) (citing *Advo–System, Inc. v. Maxway Corp.*, 37 F.3d 1044, 1051 (4th Cir. 1994)).

[89] *Id.* at 393-94 ("The [d]efendant's expert did not present any statistics or other objective basis for his conclusions.  Further, he did not testify that 45, 50 or 60 days was, in fact, the payment terms in the industry, but only, a 'good target to shoot for.'  We conclude that this is insufficient to meet the Defendant's burden of proof to establish an ordinary course of business defense under section 547(c)(2)(C).").

[90] *See In re Cherrydale Farms, Inc.*, No. 99-597, 2001 WL 1820323, at *5 (Bankr. D. Del. Feb. 20, 2001). Within *Cherrydale,* the Court accepted an affidavit from the company's CFO to determine the industry standard regarding earned commissions. The CFO drew on his own direct knowledge from many years of experience with the company and the industry, and no contrary evidence had been provided or even alleged. Notably, however, because of the long pre-insolvency period between the two parties in the case, the Court did not, and did not need to, extensively scrutinize industry standards against the parties' practices.

[91] *In re Global Tissue L.L.C.*, 106 F. App'x 99, 103 (3d Cir. 2004) (commenting on the result in *Cherrydale*).

[92] *In re Sacred Heart Hosp. of Norristown*, 200 B.R. 114 (Bankr. E.D. Pa. 1996).

in specificity, consisting of merely broad estimates of a wide range of delay time in payments (90 to 150 days)."[93]

Here, the evidence consists of mere undetailed allegations from Dennis about various acceptable ranges of payment dates in the industry, which, much like the evidence provided within *In re U.S. Interactive, Inc.,* lack an objective basis or any statistical analysis.  While Dennis has relevant and significant industry experience, he was unable to provide any objective data or reports.

As Defendant has failed to establish the existence of "ordinary business terms." The Court need not and cannot compare the transactions that did occur to the common credit terms and payment practices used in the relevant industry.  Thus, no further analysis is required and Defendant has failed to establish a defense under section 547(c)(2)(b).

**3)  Contemporaneous Exchange of New Value Defense**

Section 547(c)(1) provides:

(c)  the trustee may not avoid under this section a transfer –

(1)  to the extent such transfer was –

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange.[94]

---

[93] *Id.* at 119.

[94] 11 U.S.C. § 547(c)(1).

Thus, under section 547(c)(1), a transfer that would otherwise be considered preferential is insulated from attack by the trustee if (1) the preference defendant extended new value to the debtor,[95] (2) both the defendant and the debtor intended the new value and reciprocal transfer by the debtor to be contemporaneous, and (3) the exchange was in fact contemporaneous.[96]

### a) Parties To Transaction Must Have Requisite Intent

Transactions that appear at first glance to be a contemporaneous exchange for new value will not be so considered absent a showing that the parties actually intended the exchange to be contemporaneous. For example, a vendor who conditions continue deliveries to the buyer on the buyer's payment of old invoices will not be protected by section 547(c)(1) from attack by the buyer's trustee, even though the buyer's payment to the vendor and the vendor's transfer property to the buyer occurred contemporaneously.[97] The question is one of intent and, although a delay between the incurrence of the debt and its payment can evidence that the exchange was not intended to be contemporaneous, the passage of time does not necessarily negate that intent.[98] Moreover, the parties may intend that transfers are part of a contemporaneous exchange for "new value" under a line of credit in which, on the date of the payment, the availability of credit is increased by the amount of the payment received by the vendor

---

[95] New value is defined in 11 U.S.C. § 547(a)(2).

[96] *See Campbell v. Hanover Ins. Co. (In re ESA Envtl. Specialists, Inc.)*, 709 F.3d 388 (4th Cir. 2013) (Congress's purpose in section 547(c)(1) was to encourage creditors to deal with troubled debtors).

[97] *See, e.g., McClendon v. Cal-Wood Door (In re Wadsworth Bldg. Components, Inc.)*, 711 F.2d 122 (9th Cir. 1983).

[98] *Hechinger Investment Co. of Del., Inc., supra*.

and the debtor immediately makes use of the new availability by charging new shipments to its account with the vendor.[99]

### b) Exchange Must In Fact Be Contemporaneous

Under subsection 547(c)(1)(B), the exchange of new value between the debtor and the defendant must in fact be substantially contemporaneous. For these purposes, payment by check can satisfy this requirement.[100]  Intention that an exchange be contemporaneous is not relevant to courts determination whether the exchanges in fact contemporaneous.[101] There is some flexibility in determining whether exchange is substantially contemporaneous. In one case, a vendor and debtor agreed that shipments from the vendor were to be paid for "immediately."  In fact, the payments being attacked were made eight days and 11 days after delivery. The court held that, given the complexities inherent in generating the required paperwork, the payments were substantially contemporaneous.

### c) The Transfers At Issue Were Neither Intended To Be Contemporaneous Nor, In Fact, Contemporaneous.

As stated by the Court in *In re Hechinger* "the inquiry still remains: even if a credit relationship was intended, was it nonetheless their intent that the ongoing payments would be contemporaneous exchange for new value even when the transaction is styled

---

[99] *Hechinger Investment Co. of Del., Inc.*, 489 F.3d at 576, n. 4 (citing *In re Roemig*, 123 B.R. 405, 408 (Bankr.D.N.M.1991)).

[100] *In re Standard Food Services, Inc.*, 723 F.2d 820, 821 (11th Cir. 1984).

[101] *See, e.g., Butz v. Pingel (In re Pingel)*, 17 B.R. 236, 238 (Bankr. S.D. Ohio 1982) (perfection of transfer nine days before bankruptcy petition, but over one year after parties intended the transfer to occur, held not to be contemporaneous in fact).

as a credit transaction."[102]   As stated above, in the case at bar, there is no evidence in the record to indicate that the parties intended at any time during the Preference Period for the transfers to be contemporaneous. Defendant's trial exhibits and the testimony of Dennis prove the contrary. As stated, *supra*, the ordinary course of dealings of the parties were for the Debtor to order products and pay outstanding invoices within either net 30 or net 60 days. Defendant's Trial Exhibit B indicates that the Debtors routinely paid invoices on an average of 52.8 days after their issuance. Defendant's Trial Exhibit B further shows that checks sent by the Debtors were often referenced to pay specific old invoices. Finally, the declaration of Michael Disbrow indicates that it was the practice of Defendant to apply payment to old invoices. Therefore, the Court finds that the parties never intended the payments made during the Preference Period to be contemporaneous exchanges.

Courts in the Third Circuit have found that checks sent to the supplier of goods during the Preference Period that were earmarked to be applied to old invoices were not intended by the parties to be contemporaneous exchanges, and in fact, were not contemporaneous exchanges.[103]   Defendant argues that the transfers that took place during the Preference Period were, in fact, contemporaneous because none of the relevant invoices during the Preference Period were overdue and therefore the payments were for current invoices. Defendant relies on Judge Walrath's finding in *In re NWL Holdings,*

---

[102] *Hechinger Inv. Co. of Delaware, Inc.,* 489 F.3d at 574-75.

[103] *Official Committee of Unsecured Creditors of Contempri Homes, Inc. v. Seven D Wholesale, Inc. (In re Contempri Homes, Inc.)* 269 B.R. 124 (Bankr. M.D. Pa. 2001).

*Inc.*[104] which stated in pertinent part that a delay of up to thirty days is substantially contemporaneous for the purposes of 547(c)(1).  For the same reasons listed above, this Court finds the transfers between the Debtors and Defendant during the Preference Period were not, in fact, contemporaneous.

Defendant's Exhibit B and the Declaration of Michael Disbrow show that it was the practice of the Defendant, both during the Historical Period and Preference Period, to apply transfers to the oldest outstanding invoices if no instructions accompanying the check referenced specific invoices. The record further shows that at no time did the Debtor communicate to the Defendant that they wished any transfer to be applied contemporaneously with a corresponding order. Similar to the defendant in *In re Contempri Home*, and as the charts, *supra,* indicate, it was common both during the Historical Period and Preference Period for the Debtors to earmark checks to be applied to old invoices.  Finally, the testimony of Dennis establishes that late payments were in the ordinary course of business between the two parties, and if checks sent by Debtors were not earmarked with specific instructions it was the practice of Revchem to apply the checks to the oldest outstanding invoice(s). Based on the facts listed above, the Court finds the transfers at issue were neither intended to be contemporaneous nor, in fact, contemporaneous.

---

[104] *Giuliano v. RPG MGmt. Inc. (In re NWL Holdings Inc.),* Case No. 08-12847, Adv. No. 10-53535, *16 (Bankr. D. Del. June 4, 2013).

## CONCLUSION

The issue before the Court is whether Defendant, who has the burden of proof, has established that the subject preferential transactions cannot be avoided under the ordinary course of business or the contemporaneous exchange of new value defenses set for in section 547(c) of the Bankruptcy Code.  Based on the record at trial and as set forth above, Defendant has established that all of the transactions were "in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was (a) made in the ordinary course of business of the debtor and transferee."  Defendant has not, however, established that they were "(b) made according to ordinary business terms."  As sections (a) and (b) of section 547(c)(2) are written in the disjunctive, Defendant need establish only one in order to prevail.

With regard to the contemporaneous exchange of new value defense, Defendant has failed to show that the transfers were either "intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor" or "in fact a substantially contemporaneous exchange."

However, Defendant need only establish one affirmative defense to avoid liability. As all of the transfers were "made in the ordinary course of business of the debtor and transferee," Defendant has established a complete defense and judgment will be entered in Defendant's favor under Federal Rule of Bankruptcy Procedure 7058.